FOR PUBLICATION                          [Dkt. Ents. 28, 34]

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

```
_____ :
BROTHERHOOD OF MAINTENANCE            :
OF WAY EMPLOYES DIVISION/IBT,         :   Civil Action No.
                                      :   10-925 (RMB/JS)
          Plaintiff,                  :
                                      :   Member cases:
          v.                          :       10-926
                                      :       10-931
CONSOLIDATED RAIL CORPORATION,        :       10-932
                                      :       10-934
          Defendant.                  :
                                      :       OPINION
_____ :
```

APPEARANCES:

Matthew D. Areman, Esq.
Markowitz & Richman
1100 North American Building
121 South Broad Street
Philadelphia, Pennsylvania 19107

          Attorney for Plaintiff

Kelly Lynn Bannister, Esq.
Buchanan Ingersoll & Rooney PC
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, Pennsylvania 19102-2555

          Attorney for Defendant

**BUMB**, UNITED STATES DISTRICT JUDGE:

This case comes before the Court for review of several
arbitration awards issued by the National Railroad Adjustment
Board ("NRAB" or the "Board"), involving disputes between
plaintiff Brotherhood of Maintenance of Way Employes Division/IBT
("BMWED" or the "Union") and defendant Consolidated Rail
Corporation ("Conrail").  The disputes arise from Conrail's use
of non-Union contractors to perform maintenance of way work at
various railroad yard locations in Michigan, Pennsylvania, and
New Jersey.  The NRAB dismissed the Union's claims for lack of
jurisdiction, finding that their resolution required
interpretation of an implementing agreement, which had been
mandated by the Surface Transportation Board ("STB") as part of a
prior merger.

BMWED appealed the Board's decisions to this Court and now
moves for summary judgment, arguing that the Board had
jurisdiction over these claims and improperly refused to
adjudicate them.  It seeks an order from this Court, vacating and
remanding the awards to the NRAB for decision on their merits.
Conrail opposes this motion and filed a cross-motion for summary
judgment, arguing that the STB has exclusive jurisdiction over
these claims, and therefore, the NRAB properly dismissed them.
For the following reasons, the Court denies the Union's motion
and grants Conrail's cross-motion.

## I. BACKGROUND

Defendant Conrail is a "carrier" as that term is defined in the Railway Labor Act, 45 U.S.C. § 151 (2011). (Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("SUMF") 8, Dkt. Ent. 34-4.) It conducts rail operations in New Jersey, Pennsylvania, and Michigan. (Id.) Conrail's maintenance of way employees are represented by BMWED. They inspect, construct, maintain, and repair certain track and other structures operated by Conrail. (Id. 7.) The rates of pay, rules and working conditions of these employees are governed by the terms of a collective bargaining agreement ("CBA") between Conrail and the Union. (See Pl.'s SUMF 9.) The CBA also includes what is known as a "Scope Rule," which defines certain work as maintenance of way work and places limitations on Conrail's ability to contract out such work. (See id. 10.)

On July 23, 1998, the STB approved the acquisition of control of Conrail Inc. and Consolidated Rail Corporation by CSX Corporation and CSX Transportation, Inc. ("CSX"), and Norfolk Southern Corporation and Norfolk Southern Railway Company ("NS") (the "Conrail Transaction").[1] (Pl.'s Ex. 6; Def.'s Ex. A.) In approving the Conrail Transaction, the STB imposed labor-

---

[1] The STB, formerly the Interstate Commerce Commission, is responsible for approving various types of railroad transactions, such as acquisitions and mergers. See 49 U.S.C. § 11323(a) (2011).

3

protective conditions as prescribed by New York Dock Railway - Control - Brooklyn Eastern District Terminal, 360 I.C.C. 60 (1979), aff'd, New York Dock Railway v. United States, 609 F.2d 83 (2d Cir. 1979) ("New York Dock").  These conditions, commonly called the "New York Dock conditions," provide for, inter alia, financial benefits for employees who suffer a loss of compensation or employment as a result of an STB-approved transaction.  Any disputes over claims for employee protective displacement and dismissal benefits arising from such transactions are resolved by STB arbitrators under the New York Dock arbitration procedures set forth in § 4 of the New York Dock conditions.  See also CSX Transp. v. Transp. Comm. Int'l Union, 480 F.3d 678, 680 (4th Cir. 2007).

Subsequent to approval of the Conrail Transaction, disputes arose between BMWED and Conrail relating to employee pay and benefits, including the extent to which Conrail would be permitted to use outside contractors for maintenance of way work. (Def.'s SUMF  5.)  Thus, pursuant to Article I, § 4 of New York Dock, the parties submitted their disputes to a New York Dock arbitrator acting under the authority of the STB.  (Pl.'s SUMF 15-16.)

On January 14, 1999, the New York Dock arbitrator issued his ruling.  (See Pl.'s Exs. 7-8.)  The arbitrator ruled in relevant part:

4

> Restriction on contracting out, either through the
> scope clause of a CBA or a specific prohibition
> therein, is a common provision in railroad CBAs. . . .
> However, the application of such restrictions in the
> instant case would cause serious delay to
> implementation of the transaction insofar as capital
> improvements are concerned and would unduly burden
> C[onrail] with an employee compliment it could not keep
> working efficiently.  Accordingly, elimination of those
> restrictions meets the necessity test set forth by the
> STB . . . .

(Pl.'s Ex. 7, at 14.)   The arbitrator concomitantly issued an

implementing agreement between Conrail, CSX, Norfolk Southern and

BMWED (the "Implementing Agreement").   (See Pl.'s Ex. 8.)   For

projects required for the initial construction and maintenance of

the newly formed rail system, Conrail was given the right to

contract out such work to non-Union employees without notice to

BMWED.  Specifically, the Implementing Agreement states:

> Contractors may be used without notice to augment CSXT,
> NSR, or [Conrail] forces as needed to perform
> construction and rehabilitation projects such as
> initial new construction of connection tracks, sidings,
> mainline, yard tracks, new or expanded terminals and
> crossing improvements[] initially required for
> implementing the Operating Plan and to achieve the
> benefits of the transaction as approved by the STB . .
> . .

(Implementing Agreement art. I § 1(h), Pl.'s Ex. 8.)   The

Implementing Agreement also provided that since Conrail would no

longer have the "system support" it had had prior to the Conrail

Transaction, work that exceeded "routine maintenance" at certain

sites would be performed by CSXT or NSR in accordance with their

respective collective bargaining agreements.  (Implementing Agreement art. I § 1(i)(5).)[2]

Subsequent to the Implementing Agreement, at various times between 2000 and 2004, Conrail contracted out maintenance of way work at the SAA's.  (See Def.'s Ex. A at 228; Def.'s SUMF ¶ 11; Pl.'s Ex. 6 at 31.)  Conrail contended that the Implementing Agreement permitted it to contract out such work.  BMWED, however, challenged Conrail's decision to assign non-Union contractors and filed grievances under the CBA.  In the grievances, the Union challenged:

   (1) Conrail's use of outside forces to perform new track construction in the South Philadelphia SAA from October 30, 2000, through February 9, 2001 (Pl.'s Ex. 1, Award No. 38988);

   (2) Conrail's contracting out of various components of a major project at the Detroit SAA, Livernois Yard, from April to June 2004 (Pl.'s Exs. 2, 3, 5, Award Nos. 39877, 39878, 39880; Def.'s SUMF ¶ 17); and

   (3) Conrail's contracting out of track relocation work at the South Jersey SAA in December 2001 (Pl.'s Ex. 4, Award No. 39879).

BMWED argued that this work was reserved for Conrail maintenance of way employees, not outside forces, and that even if the work could be contracted out, Conrail had failed to give the required notice and to meet and negotiate in good faith.  (Pl.'s SUMF ¶ 19.)  Conrail responded that it had not violated the CBA.  It

---

[2] These sites consist of three separate projects known as Shared Asset Areas ("SAA's") in Michigan, Pennsylvania, and New Jersey.  (See Def.'s Ex. A at 228.)

argued that the terms of the Implementing Agreement permitted it to contract out the work and to do so without notice, because these projects were beyond routine maintenance and were initially required to achieve the efficiencies of the Conrail Transaction. (Def.'s SUMF  13-19.)

BMWED's claims (five in total) were referred to the Third Division of the NRAB.[3]   The NRAB issued five separate awards, dismissing BMWED's claims and concluding that the Board lacked jurisdiction to consider disputes involving the interpretation of the Implementing Agreement.  (Pl.'s Exs. 1-5.)  BMWED filed petitions for review of each of these awards under the Railway Labor Act, 45 U.S.C. § 153 First (q),[4] which resulted in five civil actions consolidated before this Court:

> Award No. 38988, issued on March 27, 2008, involving the South Philadelphia SAA (Pl.'s Ex. 1); petition for review filed in Civil Action No. 10-925 (RMB);

> Award No. 39877, issued on July 31, 2009, involving Detroit's Livernois Yard (Pl.'s Ex. 2); petition for review filed in Civil Action No. 10-926 (JBS);

---

[3] The NRAB's jurisdiction includes "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . ."  See 45 U.S.C. § 153 First (i).

[4] The Court ordered supplemental briefing to establish that venue was proper, since Petitioner in the lead and member cases had alleged venue only pursuant to 28 U.S.C. §§ 1391(b-c) and not pursuant to the Railway Labor Act's venue provision, 45 U.S.C. §§ 153 (p-q) (2011).  [Dkt. Ent. 38.]  Petitioner filed a letter brief addressing this matter.  The Court is now satisfied that venue in this jurisdiction is proper.  [Dkt. Ent. 40.]

Award No. 39878, issued on July 31, 2009, involving Detroit's Livernois Yard (Pl.'s Ex. 3); petition for review filed in Civil Action No. 10-931 (JEI);

Award No. 39879, issued on July 31, 2009, involving South Jersey SAA (Pl.'s Ex. 4); petition for review filed in Civil Action No. 10-932 (RBK); and

Award No. 39880, issued on July 31, 2009, involving Detroit's Livernois Yard (Pl.'s Ex. 5); petition for review filed in Civil Action No. 10-934 (NLH).[5]

BMWED now seeks an order vacating each Award and remanding them to the NRAB for decision on their merits.  Conrail has cross-moved for an order dismissing each of the appeals, arguing that the NRAB and this Court lack jurisdiction to interpret the terms of a <u>New York Dock</u> implementing agreement.[6]

---

[5] On June 17, 2010, this Court entered an Order consolidating all actions. [Dkt. Ent. 18.]

[6] Conrail filed a reply to its cross-motion in violation of Local Rule 7.1(d)(3), which provides that "[n]o reply papers shall be filed . . . on a cross-motion, unless the Court otherwise orders." [Dkt. Ent. 39.]  While the Court does not look favorably on this failure to abide by the Local Rules, it nevertheless exercises its discretion to grant permission to file the reply <u>nunc pro tunc</u>, given the complexity and novelty of the case, the fact that Conrail's failure to seek permission was likely an oversight, that BMWED did not object to it, and that this Court would likely have granted permission if it had been timely requested.  <u>See</u>, <u>e.g.</u>, <u>McGarvey v. Penske Auto. Group, Inc.</u>, Civ. Action No. 08-5610, 2010 WL 1379967, *9 (D.N.J. 2010) (granting permission to file reply <u>nunc pro tunc</u> given complexity and novelty of case, that failure to seek permission was an oversight, and that request would have been granted if timely made); <u>Port Authority of NY & NJ v. Am. Stevedoring, Inc.</u>, Civ. Action No. 09-4299, 2011 WL 1399079, *2 n.1 (D.N.J. 2011) (despite plaintiff's failure to timely seek leave to file reply, court found "good cause to permit and consider [it], in order to make its decision on the merits . . . rather than on mere technicalities").

# I. STANDARD OF REVIEW

## A. Summary Judgment

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[7]  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id. at 250.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "a mere scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 249. In the face of such evidence, summary judgment is still appropriate "where the record

_____

[7] Amendments to the Federal Rules of Civil Procedure became effective on December 1, 2010. The oft-cited summary judgment standard is now located in Rule 56(a) rather than Rule 56(c). Although the wording of the standard has changed slightly, replacing the word "issue" with "dispute" ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact"), this change does not affect the substantive standard or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56(a) advisory committee's note (emphasis added).

. . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986). "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'" Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995).

**B. Judicial Review of the Board's Decisions**

The Supreme Court has characterized the scope of judicial review of NRAB awards as "among the narrowest known to the law." Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 91 (1978); Bhd. of Maint. of Way Employees v. Consol. R. Corp., 864 F.2d 283, 287 (3d Cir. 1988).  The Supreme Court "time and again has emphasized and re-emphasized that Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board." Gunther v. San Diego & Ariz. E. Ry. Co., 382 U.S. 257, 263 (1965).  Indeed, the RLA permits review of an NRAB award by this Court in only three limited circumstances: (1) "failure of the [NRAB] to comply with the requirements of the RLA"; (2) "failure of the [NRAB] to conform, or confine, itself to matters within the scope of its jurisdiction," or (3) "fraud or corruption by a member of the division making the order." See Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment Cent. Region, - U.S. -, 130 S. Ct. 584, 593 (2009) (citing 45 U.S.C. § 153 First (q)); Sheehan, 439 U.S. at 93.  Thus, a federal district court may review an NRAB award where the Board had jurisdiction over a matter, but declined to exercise it.  See Union Pac. R. Co., 130 S. Ct. at 590-91 (finding that NRAB had improperly declined jurisdiction to adjudicate grievances of railroad employees that remained unsettled after pursuit of internal procedures).

## II. ANALYSIS

BMWED acknowledges this highly deferential standard of review, but argues that the arbitration awards must be vacated because the NRAB refused to exercise its jurisdiction and perform its statutory function under the RLA. This Court must therefore determine whether a genuine issue of material fact exists as to whether the NRAB properly declined jurisdiction over the instant claims. Accordingly, the question presented to this Court is the following: who has jurisdiction to resolve BMWED's claims against Conrail - the NRAB, acting under the authority of the Railway Labor Act, or the arbitrator designated by the STB to interpret the terms of the Implementing Agreement, acting under the authority of the Interstate Commerce Act? Both Acts are briefly summarized below.

### A.    Interstate Commerce Act

Chapter 113 of the Interstate Commerce Act, 49 U.S.C. § 11301 et seq. (2011) (the "ICA"), grants the United States Surface Transportation Board, formerly the Interstate Commerce Commission, "exclusive authority to examine, condition, and approve mergers and consolidations of transportation carriers within its jurisdiction." Norfolk & Western Ry. V. Am. Train Dispatchers' Assoc., 499 U.S. 117, 119-120 (1991) (citing the ICA provision now codified at 49 U.S.C. § 11323(a)(1)) (hereinafter "Dispatchers"). When a proposed merger involves rail carriers,

12

49 U.S.C. § 11326 of the ICA requires the STB to impose labor-protective conditions on the transaction "to safeguard the interests of adversely affected railroad employees." Id. at 120; See also Union R.R. Co. v. United Steelworkers of Am., 242 F.3d 458, 464 (3d Cir. 2001) ("Recognizing that consolidations of carriers would result in employee dismissals, transfers and other changes detrimental to employees, the ICA mandated that the ICC impose safeguards, like the New York Dock employee protective conditions, to ensure that employee interests of the affected parties are protected.") (hereinafter "Steelworkers").

In New York Dock, the ICC announced a comprehensive set of conditions and procedures designed to meet its obligations under § 11326.  360 I.C.C. at 84-90.  Section 2 of the New York Dock conditions provides that the "rates of pay, rules, working conditions and all collective  bargaining and other rights, privileges and benefits . . . under applicable laws and/or existing collective bargaining agreements . . . shall be preserved unless changed by future collective bargaining agreements."  New York Dock, 360 I.C.C. at 84.  As discussed above, § 4 sets forth negotiation and arbitration procedures for resolution of labor disputes arising from an approved railroad merger. Id. at 85.

**B.   Railway Labor Act**

13

The Railway Labor Act "governs the negotiation, enforcement and modification of collective bargaining agreements between railroad carriers and rail labor unions." See Ry. Labor Executives' Ass'n v. S. Pac. Transp. Co., 7 F.3d 902, 904 (9th Cir. 1993), cert. den'd, 510 U.S. 1193 (1994). The RLA provides a framework for the resolution of disputes between employees and carriers arising from the application or interpretation of a collective bargaining agreement. Union Pac. R.R. v. Price, 360 U.S. 601, 609-10 (1959). These types of disputes are commonly referred to as "minor disputes" because they contemplate the existence of an already negotiated collective bargaining agreement and relate to the interpretation of such agreements concerning rates of pay, rules, or working conditions. Consol. Ry. Corp. v. Ry. Labor Executives Ass'n, 491 U.S. 299, 303 (1989); see 45 U.S.C. § 153(i) (2011).[8] The RLA gives the NRAB jurisdiction over such disputes. 45 U.S.C. § 153(i).[9] "Work assignment disputes are generally considered minor disputes" and

---

[8] By contrast, "major disputes" relate to the formation of collective bargaining agreements and involve a lengthier dispute resolution process. Consol. Ry. Corp., 491 U.S. at 302-04.

[9] The resolution of these minor disputes is accomplished by mandatory arbitration before panels composed of two representatives of labor and two of industry, with a neutral referee serving as tiebreaker. See Union Pac. R.R. Co. v. Brotherhood of Locomotive Engineers, - U.S. -, 130 S. Ct. 584, 591 (2009) ("To supply the representative arbitrators, Congress established the NRAB, a board of 34 private persons representing labor and industry in equal numbers.").

14

thus fall within the exclusive jurisdiction of the NRAB as well. <u>CSX Transp., Inc. v. Transp. Commc'ns Intern. Union</u>, 480 F.3d 678, 683 (4th Cir. 2007) (citing <u>Transp. Commc'n Employees Union v. Union Pac. R.R.</u>, 385 U.S. 157, 164 (1966); <u>Slocum v. Del., Lackawanna & W. R.R. Co.</u>, 339 U.S. 239, 244 (1950)).

### C.   Limitations Under Each Act

The ICA reflects Congress's commitment to a national policy favoring the consolidation of railroads.  <u>See</u> <u>Steelworkers</u>, 242 F.3d at 468.  The Act promotes economy and efficiency within the rail industry by "giv[ing] the STB considerable authority over railroads, granting to it exclusive jurisdiction to authorize railroad mergers and consolidations."  <u>Id.</u> at 466 (citing 49 U.S.C. § 11321(a); <u>Dispatchers</u>, 499 U.S. at 119-20).  This "free[s] rail consolidations from burdensome delays and expenditures associated with RLA procedures.  Thus, the ICA and the RLA are not complementary and co-equal statutory schemes. . . .  The RLA must yield to the ICA when it impedes the implementation of a STB-approved consolidation."  <u>Id.</u> at 468.

This principle originates, in part, from a provision of the ICA that expressly exempts rail carriers participating in STB-approved transactions from "all other law . . . as necessary to let that rail carrier . . . carry out the transaction . . . ."  49 U.S.C. § 11321(a).  Noting the broad language of this provision, the United States Supreme Court has held that it

15

exempts carriers from their collective-bargaining obligations under the RLA where necessary to carry out an STB-approved transaction.  Dispatchers, 499 U.S. at 132.  The Dispatchers Court stressed that this interpretation "makes sense of the consolidation provisions" of the ICA, which were designed "to promote economy and efficiency in interstate transportation." Id. at 132-33; see also Del. & Hudson Ry. Co., 8 I.C.C. 2d 839, 846 (1992) ("The Supreme Court in [Dispatchers] recognized that displacement of the RLA dispute resolution procedures is necessary to assure that ICC-approved transactions go forward."). The Court also noted that the ICA's "labor-protecting requirements" seek to ensure that the STB accommodates the interests of affected employees to the greatest extent possible. Dispatchers 499 U.S. at 132-33 (citing Texas v. United States, 292 U.S. 522, 534-35 (1934)).

    If the ICA did not supersede the RLA in this manner, "rail carrier consolidations would be difficult if not impossible to achieve.  The resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought [in consolidating] would be defeated."  Dispatchers, 499 U.S. at 133 (citing Burlington N. R. Co. v. Bhd. of Maint. of Way Employes, 481 U.S. 429, 444, (1987) (RLA resolution procedures "virtually endless"); Detroit & T. S. L. R. Co. v. United Transp. Union, 396 U.S. 142, 149,

(1969) (dispute resolution under RLA involves "an almost
interminable process"); Bhd. of Ry. & S.S. Clerks v. Florida E.
Coast Ry. Co., 384 U.S. 238, 246 (1966) (RLA procedures are
"purposely long and drawn out")).  Thus, the STB has "exclusive
jurisdiction" to adjudicate challenges to the implementation of
STB-approved consolidations.  Steelworkers, 242 F.3d at 468.

    This jurisdiction, however, is neither timeless nor
limitless.  See Del. & Hudson Ry. Co., 8 I.C.C. 2d 839, 845
(1992).  "At some point, STB jurisdiction over the interpretation
of an implementing agreement ceases, and 'the parties will be
required to resort to the Railway Labor Act to resolve disputes
arising under [their] collective bargaining agreements then in
effect.'"  CSX Transp., Inc., 480 F.3d at 684 (quoting Del. &
Hudson Ry. Co., 8 I.C.C. 2d at 845-46; citing Harris v. Union
Pac. R.R., 141 F.3d 740, 744 (7th Cir. 1998) (rejecting the
railroad's understanding of [49 U.S.C. § 11321(a)], that the STB
is "forever in charge of all legal disputes related to a
merger")).  The point at which this occurs turns on: 1) the time
elapsed since the approved transaction was completed or since the
implementing agreement was issued, and 2) the nature of the
disputes - i.e., whether they draw their essence from the
collective bargaining agreement or the STB-approved implementing
agreement.  See id. at 684-85 & n.5 (finding NRAB jurisdiction
proper given the "amount of time that has passed since the

approved transaction was successfully completed" and the fact
that the disputes "drew their essence from the interpretation and
enforcement" of the CBA); Del & Hudson Ry. Co., 8 I.C.C. 2d at
846 (finding STB jurisdiction proper where implementing agreement
was "less than two years old" and issues went "directly to the
heart of the elements of the implementing agreement").

###    D.   Discussion

The first factor this Court considers, then, in assessing
whether the STB has jurisdiction, is the time elapsed since the
issuance of the implementing agreement or since the approved
transaction was completed; the greater the lapse of time, the
greater the likelihood that the STB no longer retains
jurisdiction. See id. Here, the Implementing Agreement was
issued in 1999, and Conrail contracted out the disputed work
pursuant to that Agreement at various times between 2000 and
2004. Notably, it appears the SAA work was contracted out
pursuant to the Implementing Agreement as part of the
implementation of the Conrail Transaction. Thus, the timing of
the disputes tends to favor STB jurisdiction. See infra pp. 27-
28.

Next, the Court must consider the nature of the disputes;
specifically, whether they draw their essence from the collective
bargaining agreement or the New York Dock implementing agreement.
BMWED argues that its claims assert violations of the CBA and

18

thus the NRAB erred by refusing to adjudicate them.  It contends that Conrail violated the CBA by contracting out maintenance of way work contrary to the CBA's "Scope Rule."  Conrail counters that the dispute, although labeled a CBA dispute, is in reality, a dispute over the interpretation and scope of the Implementing Agreement.  Thus, because the STB has the exclusive jurisdiction to adjudicate such challenges, the NRAB correctly declined to exercise jurisdiction.

This Court agrees with Conrail.  It is clear from the record before the NRAB that these claims are not the typical minor disputes involving the interpretation of a collective bargaining agreement.  Rather, the critical question raised by each of the claims is whether the Implementing Agreement permitted Conrail to contract out the work in question.  In three of the arbitration awards, the NRAB found it "clear" from the "extensive record" in each case that both parties were relying on Implementing Agreement provisions, and thus the Board had no jurisdiction to resolve the dispute.  (Pl.'s Ex. 2, Award No. 39877 at 10; Pl.'s Ex. 3, Award No. 39878 at 9; Pl.'s Ex. 5, Award No. 39880 at 9.)

In the fourth award, BMWED argued that the disputed work was not covered by Section 1(h) of the Implementing Agreement, because it did not appear on a list of projects planned for outside contractors that Conrail had furnished to the Union.  (Pl.'s Ex. 1, Award No. 38988 at 3.)  The Board recognized that

19

the claim concerned whether the work Conrail had contracted out
fell within the purview of the Implementing Agreement.
Accordingly, it dismissed the claim, acknowledging the
"substantial jurisdictional question" at issue, the language of
the Implementing Agreement, and the "clearly established
precedent that the Board has no jurisdiction to consider disputes
arising under implementing agreements established pursuant to New
York Dock." (Id. at 3-4.)  The NRAB noted that the dispute could
"only be decided by a duly authorized board constituted pursuant
to New York Dock." (Id. at 4.)  In the fifth award, the Board
cited to Award Number 38988 and concluded that it lacked
jurisdiction to resolve the "procedural argument" regarding
whether the dispute fell under the Implementing Agreement.
(Pl.'s Ex. 4, Award No. 39879 at 8.)

     Furthermore, the record reflects that both sides argued to
the NRAB the applicability of the Implementing Agreement.  In
each case, BMWED disputed Conrail's interpretation of the
Implementing Agreement.  The very first paragraph of BMWED's
submissions in four of the five cases before the NRAB assert that
"[t]he Implementing Agreement made no provisions for the
contracting out of [Conrail] Scope covered work and such work
remains governed by the provisions of the [CBA] between the
parties to this dispute." (Def.'s Exs. E-H at 3.)  Three of
BMWED's submissions alleged that "the Carrier's purported plans

20

to contract out said work were directly in conflict with Article
I, Section 1(i)(5) of the . . . Implementing Agreement." (Def.'s
Exs. E at 8, F at 8; H at 7.)   Conrail, on the other hand,
argued that the Implementing Agreement allowed it to contract out
the work in question, for reasons that varied according to the
project.

The STB has made clear that it has exclusive jurisdiction to
resolve disputes arising from a <u>New York Dock</u> implementing
agreement.  <u>See</u> <u>infra</u> pp. 29-30; <u>Del. & Hudson Ry. Co.</u>, 8 I.C.C.
2d at 845; <u>see</u> <u>also</u> <u>Steelworkers</u>, 242 F.3d at 467 (3d Cir. 2001).
In <u>Delaware & Hudson Railway Company</u>, the STB underscored this
point by affirming a cease and desist order that prevented the
union from litigating the terms of the implementing agreement
under the Railway Labor Act and ordering the parties to arbitrate
the disputes under the STB-imposed <u>New York Dock</u> framework.   8
I.C.C. 2d at 839-40.

In <u>Steelworkers</u>, the Third Circuit Court of Appeals
established a closely related principle: that to the extent a
transaction subject to STB approval "impacts collective
bargaining agreements or the relationship between railroads and
their employees, the STB has exclusive jurisdiction <u>in the first</u>
<u>instance</u> to consider the issues."  242 F.3d at 467 (emphasis
added) (quoting <u>Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen</u>,
164 F.3d 847, 855 (4th Cir. 1998)).  There, the Court considered

21

whether a federal district court has subject matter jurisdiction to adjudicate disputes over changes to a collective bargaining agreement made in connection with a rail merger that the STB had authorized.  242 F.3d at 460.  Following the merger, the carrier sought to consolidate certain clerical work.  When negotiations between the parties failed, the railroad sought to arbitrate the dispute under Article I, § 4 of New York Dock, which provides that if the carrier and union cannot agree on how to implement certain changes resulting from a transaction, "either party may submit the dispute to arbitration before an arbitrator acting pursuant to STB authority."  Id. at 460-61 & n.2.  The union argued that it could not be compelled to arbitrate under New York Dock and attempted to resolve the dispute under RLA procedures, seeking declaratory and injunctive relief to that effect in federal court.  Id. at 461-62.  The district court dismissed the case for lack of jurisdiction, finding that "the propriety of the Railroad's invocation of the New York Dock process must be resolved by the STB, and by the Court of Appeals."  Id. at 462 (internal quotations omitted).  The Third Circuit affirmed, adopting the Ninth and Fourth Circuits' interpretation of Dispatchers: that the STB - not the district court - has the exclusive authority to resolve labor disputes arising from implementation of STB-authorized transactions.  Id. at 464, 467

22

(citing <u>Ry. Labor Executives' Ass'n v. S. Pac. Transp. Co.</u>, 7 F.3d 902 (9th Cir. 1993); <u>Signalmen</u>, 164 F.3d 847)).

In a similar case, relied upon by the <u>Steelworkers</u> Court, the Ninth Circuit Court of Appeals held that "where a railroad which has been a party to an ICC-approved merger claims that certain proposed actions are incident to that merger and exempt from RLA procedures under [§ 11321(a)], the ICC has exclusive authority to resolve a challenge to these claims."  <u>See Ry. Labor Executives' Ass'n v. S. Pac. Transp. Co.</u>, 7 F.3d 902, 906 (9th Cir. 1993) ("<u>Southern Pacific</u>").  In <u>Southern Pacific</u>, the railroads had proposed an operational change, which they asserted was incident to their recent merger, subject to the <u>New York Dock</u> procedures, and exempt from the RLA.  <u>Id.</u>  The unions countered that the railroads' proposal fell outside the scope of the ICC's merger approval, was not necessary to the implementation of the merger, and thus not entitled to § 11321(a) exemption.  <u>Id.</u>  The Ninth Circuit, like the Third Circuit in <u>Steelworkers</u>, concluded that since the ICC had exclusive authority to approve the merger and exempt the railroads from any law which might impede the merger, it therefore "should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section [11321(a)] exemption."  <u>Id.</u>  The Court stressed that a "contrary result would interfere with the exclusive authority

that the statutory scheme confers upon the ICC in this area."
Id.

     Although Steelworkers and Southern Pacific concern STB
jurisdiction over disputes resulting from STB-approved
transactions, and do not explicitly discuss implementing
agreements, they nevertheless establish that the STB has
exclusive jurisdiction in the first instance to clarify the scope
of its approval of such transactions and the breadth of any
exemptions from RLA procedures.  Steelworkers, 242 F.3d at 467;
Southern Pacific, 7 F.3d at 906.  The proposition set forth by
the STB in Delaware & Hudson, 8 I.C.C. 2d at 845, flows logically
from this principle: where the parties dispute the scope of a New
York Dock implementing agreement and the extent to which it
exempts the carrier from its obligations under the RLA, the STB
must also have exclusive jurisdiction in the first instance to
clarify the scope of that implementing agreement.  Indeed, it
would be illogical to require New York Dock arbitrators to
interpret the scope of an approved transaction and issue
associated implementing agreements, but require the NRAB to
interpret those agreements.

     Surely, permitting the Union to litigate the scope of a New
York Dock implementing agreement before the NRAB would frustrate
the ICA's statutory scheme and undermine the STB's ability to
facilitate mergers in an efficient manner.  This result "would

interfere with the exclusive authority that the statutory scheme confers upon the [STB] in this area." Southern Pacific, 7 F.3d at 906. As the Ninth Circuit noted in Southern Pacific, "[i]f we held that parties could litigate in federal district court the scope of an approved merger and the corresponding breadth of the section [11321(a) exemption], we would surely interfere with the ICC's ability to efficiently facilitate mergers. We would invite a barrage of collateral challenges to the ICC's authority which would be likely to frustrate and delay the administration of mergers in a way that section [11321(a)] was clearly meant to avoid." 7 F.3d at 906-07. Similarly, the STB held that if a union can "frustrate the orderly execution of the terms of an implementing agreement through resort to the RLA," it is "in effect collaterally attacking the agreement." Del. & Hudson Ry. Co., 8 I.C.C. 2d at 845.

Thus, the STB, having exclusive jurisdiction in the area of railroad mergers, must have the ability to examine and clarify the breadth and scope of a New York Dock implementing agreement in the first instance. See Southern Pacific, 7 F.3d at 906 ("[B]ecause the ICC had exclusive authority to approve the . . . merger and thereby exempt the Railroads from any . . . law which might otherwise impede the merger, it should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section [11321(a)] exemption.").

25

BMWED argues that its claims asserted violations of the CBA, as modified by the Implementing Agreement, and, thus, the NRAB was obligated to decide the dispute.  This argument misses the point.  If a party, by merely labeling the dispute a "CBA dispute" or simply failing to cite to the implementing agreement could escape the STB's jurisdiction, it could easily thwart the statutory framework set forth above.  See, e.g., Del. & Hudson Ry. Co., 8 I.C.C. 2d at 845 ("[R]ail labor must not be permitted by artful pleading to assert RLA jurisdiction over matters directly related to implementing a transaction approved by the Commission under [§ 11323] and, thereby, avoid the jurisdictional bar of [§ 11321(a)].") (citing United Transp. Union v. Norfolk & W. Ry. Co., 822 F.2d 1114, 1120 (D.C. Cir. 1987), cert. den'd, 484 U.S. 1006 (1988)).  The NRAB, like this Court, must look beyond labels to the essence of the parties' dispute.  As discussed above, there is little question that the parties' disagreement concerns whether or not the Implementing Agreement permitted Conrail to contract out the work in dispute.  Indeed, the NRAB concluded and the parties' submissions reflected, that the disagreement centered on the application and interpretation of the Implementing Agreement.  Thus, the STB was the agency charged with the exclusive authority to resolve the dispute.

BMWED argues that the Fourth Circuit's decision in CSX Transportation Incorporated v. Transportation Communications

International Union, 480 F.3d 678 (4th Cir. 2007) ("TCIU"),
supports NRAB jurisdiction over its claims.  (Pl.'s Br. 30, 38.)

    However, BMWED's reliance on TCIU is misplaced.  There, the
parties had litigated the disputes before the NRAB for over a
decade before the carrier ever raised the argument that the NRAB
had exceeded its jurisdiction in deciding the claims.  Id. at
681-82.  Further, the dispute in that case centered on the
interpretation of the parties' collective bargaining agreement,
not the terms of the implementing agreement.  The key issue was
whether clerical employees who had been transferred to a new
customer service center pursuant to the New York Dock
implementing agreement had a right to perform certain work under
the CBA.  The NRAB arbitrators in TCIU consulted the "plain terms
of the Implementing Agreement only to determine retrospectively
whether the disputed tasks were transferred . . . in the first
place."  Id. at 684-85.  Thus, the implementing agreement was
only consulted to see whether the work had, in fact, been
transferred.  The district court upheld the NRAB awards, noting
that it had not "actively interpreted the Implementing Agreement,
but instead looked at what actually transpired in terms of
whether work was transferred after 1991."  Id. at 682 (internal
quotations omitted).  The district court also relied on the fact
that the transfer of the clerical functions pursuant to the
implementing agreement "had long ended" and thus the ICC "no

longer preempted dispute resolution by the NRAB in accordance
with the Railway Labor Act." Id.  The Fourth Circuit affirmed
for similar reasons, emphasizing that the disputes "drew their
essence" not from the implementing agreement, but "from the
interpretation and enforcement of the collective bargaining
agreement between the parties." Id. at 684.  The Court rejected
the carrier's argument that the STB has jurisdiction over "all
disputes that in any way reference the New York Dock Implementing
Agreements . . . even years after the approved transaction has
been completed." Id. at 684.

TCIU is readily distinguishable from the case at bar.  This
is not a case where the parties only tangentially referred to an
implementing agreement and the key issue arises under the
parties' labor agreement.  On the contrary, the core issue in
each of the awards before this Court is whether the Implementing
Agreement permits Conrail to contract out the work in question.
Further, Conrail has alleged that it assigned the disputed work
as part of the implementation of the STB-approved transaction,
not after its completion.  Indeed, the disputes arose from the
very way in which Conrail interpreted and carried out the
Implementing Agreement.  Accordingly, these facts raise a
substantial issue as to the scope of the Implementing Agreement
that must be presented to a New York Dock panel.

28

Finally, BMWED argues that "there is no New York Dock arbitration panel that could hear and decide the disputes." (See Pl.'s Moving Br. 35-37.) The Court disagrees. As discussed above, interpretation of an implementing agreement's contractual terms is "well within" the jurisdiction of the STB and its New York Dock arbitration panels. See CSX Corp. - Control - Chessie Sys., Inc. & Seaboard Coast Line Indus., Inc., STB Finance No. 28905 (Sub-29), 2008 WL 686101, *5 (Mar. 14, 2008) ("We have recognized that interpreting [implementing] agreements is well within the expertise of [a New York Dock] arbitration panel.") (citing Union Pac. Corp., Union Pac. R.R. Co., & Mo. Pac. R.R. Co., STB Finance No. 32760 (Sub-37), slip op. at 3 (Aug. 16, 2000)); see also Union Pac. Corp., Union Pac. R.R. Co. & Mo. Pac. R.R. Co., STB Docket No. FD 32760 (Sub-45), 2010 WL 5125512, *1 (Dec. 15, 2010) (affirming arbitrator's award that interpreted implementing agreement resulting from STB-authorized merger).

In Delaware & Hudson Railway Company, 8 I.C.C. 2d 839, 839 (1992), the STB held that it retains jurisdiction under the ICA to resolve disputes involving the proper interpretation of an STB-approved implementing agreement. Id. (citing the ICA provision now codified at 49 U.S.C. § 11326). The STB first found such jurisdiction proper under Article I, § 11 of the New York Dock conditions, which provides that when the parties cannot voluntarily resolve questions involving the interpretation of

29

these conditions, they may submit them to a <u>New York Dock</u>
arbitration committee.  <u>Id.</u> at 844.  The STB reasoned that a
dispute over the proper interpretation of an implementing
agreement involves the interpretation of the STB-imposed
protective labor conditions.  <u>Id.</u>  Alternatively, the STB noted,
it has jurisdiction pursuant to Article I, § 4 of the <u>New York
Dock</u> conditions, which requires the parties to arbitrate an
implementing agreement if they cannot voluntarily arrive at one.
<u>Id.</u> at 844.  The STB reasoned that the dispute over the terms of
the implementing agreement could be viewed as a continuation of
the § 4 arbitration process that resulted in that agreement.  <u>Id.</u>
at 844-45.

    This Court agrees with the STB's analysis, for the reasons
discussed above.  If a <u>New York Dock</u> arbitration panel, acting
under authority of the STB, has authority to interpret the STB-
approved transaction and issue an agreement setting forth the
manner in which that transaction must be implemented, then the
<u>New York Dock</u> panel must also have exclusive authority to
interpret that implementing agreement.  Otherwise, the ICA's
statutory framework and the STB's exclusive jurisdiction to
oversee rail mergers in an efficient manner would be frustrated.
<u>See</u> <u>supra</u> pp. 23-25.  Accordingly, the Court rejects the Union's
claim that a <u>New York Dock</u> arbitration panel could not hear and
decide these disputes.

30

Thus, the Court finds no genuine dispute of material fact as to whether the NRAB properly denied BMWED's claims due to lack of jurisdiction.  It is clear to this Court that the NRAB properly declined jurisdiction because it lacks authority to interpret and clarify the Implementing Agreement, which is what these disputes require.  Since the NRAB did not fail to comply with the requirements of the RLA or conform to the scope of its jurisdiction, the Court must dismiss these appeals for lack of jurisdiction.

## III. CONCLUSION

For the above reasons, Conrail's cross-motion for summary judgment is granted, and BMWED's motion for summary judgment is denied.  An accompanying Order shall issue this date.


Dated: June 6, 2011                    s/Renée Marie Bumb
                                       RENÉE MARIE BUMB
                                       United States District Judge